AMOUNT $ _____ 150 —
SUMMONS ISSUED ___ 4
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY CLK _____
1-6-04

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---------------------------------------------X
JOHN G. ESPOSITO, JR., D.D.S., on Behalf :
of Himself and All Others Similarly Situated, :
:
          Plaintiff, :
:
vs. :
:
BIOPURE CORPORATION, THOMAS A. :
MOORE, CARL W. RAUSCH and :
RONALD F. RICHARDS, :
:
          Defendants. :
---------------------------------------------X

CIVIL ACTION NO.
_____

**CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS**

04 CV 10013 DPW

MAGISTRATE JUDGE _____

**JURY TRIAL DEMANDED**

Plaintiff, by his attorneys, for his Class Action Complaint (the "Complaint") alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief based upon the investigation of his attorneys as to all other matters. The investigation included a review of United States Securities and Exchange Commission ("SEC") filings by Biopure Corporation ("Biopure" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of Biopure between March 17, 2003 and December 24, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

00001358.WPD ; 1

This action is also brought under Section 20(A) of the Exchange Act on behalf of all persons who traded Biopure common shares contemporaneously with Defendants Rausch and Moore (the "Subclass").

## JURISDICTION AND VENUE

2. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

3. The claims alleged herein arise under Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

6. Plaintiff purchased the common stock of Biopure at artificially inflated prices as set forth in the certification attached to this Complaint, and suffered economic damages thereby.

7. Defendant Biopure develops, manufactures and markets oxygen therapeutics, for both humans and veterinary use, designed to serve as an alternative to red blood cell transfusions and for use in the treatment of other critical care conditions. The Company's principal executive

offices are located at 11 Hurley Street, Cambridge, Massachusetts.

8. The defendants listed below served, at all times relevant to this complaint, as senior officers and/or directors of Biopure:

| **Defendant** | **Positions** |
|---|---|
| Thomas A. Moore | President and Chief Executive Officer |
| Carl W. Rausch | Vice Chairman and Chief Technology Officer |
| Ronald F. Richard | Chief Financial Officer |

9. The defendants listed in ¶ 8 above are referred to herein as the "Individual Defendants."

10. Because of the Individual Defendants' positions with Biopure, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including Biopure's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

11. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Biopure's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers and/or directors of Biopure, by virtue of their high-level positions with Biopure, directly participated in the management of Biopure, was directly involved in the day-to-day operations of

3

Biopure at the highest levels and was privy to confidential proprietary information concerning Biopure and its businesses, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding Biopure, and approved or ratified these statements, in violation of the federal securities laws.

12.    As officers, directors and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Biopure's financial condition, performance, growth, operations, financial statements, businesses, products, markets, management, earnings, present and future business prospects and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Biopure's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

Because of their Board membership and/or executive and managerial positions with Biopure, each of the Individual Defendants had access to the adverse undisclosed information about Biopure's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Biopure and their business issued or adopted by Biopure materially false and misleading.

14. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and therefore is primarily liable for the representations contained therein.

15. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Biopure common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Biopure's businesses, operations, management and the intrinsic value of its common stock; (ii) allowed the Company to sell its common shares generating more than $36 million in proceeds; (iii) enabled the Individual Defendants and other insiders to sell more than $1.6 million worth of their personally-held shares of Biopure common stock at artificially inflated prices; and (iv) caused plaintiff and other

members of the Class to purchase Biopure securities at artificially inflated prices.

## **CLASS ACTION ALLEGATIONS**

16. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired the common stock of Biopure during the Class Period (March 17, 2003 to December 24, 2003) and who suffered damages thereby (the "Class"). Plaintiff also brings this action on behalf of all persons who traded Biopure common shares contemporaneously with Defendants Rausch and Moore during the Class Period (the "Subclass"). Excluded from the Class and Subclass are the defendants, members of their families, any entity in which any defendant is trustee or has a controlling interest, and any of their parent, subsidiaries, officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns.

17. The members of the Class and Subclass are so numerous that joinder of all members is impracticable. Throughout the Class Period, Biopure common stock was actively traded on NASDAQ. While the exact number of Class and Subclass members is unknown at this time and can only be ascertained through appropriate discovery, at a minimum, plaintiff believes that there are thousands of persons who purchased Biopure stock during the Class Period. Record owners and other members of the Class and Subclass may be identified from records maintained by Biopure or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18. Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class or Subclass. Among the questions of law and fact common to the Class are:

6

(a) whether the federal securities laws were violated by defendants as alleged herein;

(b) whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c) whether defendants participated directly or indirectly in the course of conduct complained of herein;

(d) whether the defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether Individual Defendants Rausch and Moore sold their shares of Biopure common stock while in possession of adverse material nonpublic information about Biopure;

(f) whether the market prices for Biopure common stock during the Class Period were artificially inflated by the defendants' wrongful conduct alleged in this Complaint; and

(g) whether the members of the Class and Subclass have sustained damages and, if so, the proper measure of those damages.

19. Plaintiff's claims are typical of the claims of other Class and Subclass members, all of whom have sustained damages arising out of the defendants' wrongful conduct alleged in this Complaint. Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class and/or Subclass.

20. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class and Subclass is impracticable. Furthermore, because the damages suffered by the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for the Class and Subclass members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21. Biopure purportedly develops, manufactures and market oxygen therapeutics, for both humans and veterinary use, designed to serve as an alternative to red blood cell transfusions and for use in the treatment of other critical care conditions. The Company has developed and manufactures two products: Hemopure – 250 (bovine), or HBOC-201 – for human use, and Oxyglobin – hemoglobin glutamer – 200 (bovine), or HBOC-301 – for veterinary use. On July 31, 2002, Biopure submitted a biologic license application ("BLA") to the U.S. Food and Drug Administration ("FDA") seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery. Previously the Company had obtained approval in South Africa to market Hemopure for the treatment of adult surgical patients who are acutely anemic. In September 2002, the Company received a grant from the U.S. Department of the Army for the purpose of conducting clinical trials of Hemopure for the treatment of certain trauma patients. According to the Company's fiscal 2002 10-K, "[t]he Company has identified trauma as its next clinical development priority and is working with a committee of independent civilian and military trauma experts to broaden its trauma program."

22. Known to shareholders, in March 2003, the Company submitted a "trauma study

8

protocol" to the FDA, in connection with the Company's plans to conduct a "[p]hase II clinical trial" of Hemopure for the treatment of trauma patients. Immediately thereafter, the FDA informed defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse clinical data submitted as part of the Company's July 2002 BLA seeking FDA approval to market Hemopure to orthopedic surgery patients. Importantly, this also put defendants on notice that FDA approval of the BLA, which would allow the first commercial distribution of Hemopure in the United States, was in serious doubt and most certainly would be delayed beyond the time frames previously communicated by defendants to the investing public. Over the next nine months, despite numerous opportunities in press releases, analyst conference calls and SEC filings, defendants failed to disclose any of these adverse facts to the investing public. Indeed, the Company's periodic comments regarding Hemopure during the Class Period, materially misled investors concerning the commercial viability of Hemopure and the expected commencement of marketing the product in the United States. Prior to the disclosure of these adverse facts, defendants conducted at least two offerings of Biopure common stock generating millions of dollars in proceeds and certain high-level Biopure insiders, including defendants Moore and Rausch, sold hundreds of thousands of Biopure common shares to the unsuspecting investing public at artificially inflated prices.

23. Then, on December 24, 2003, under the threat of civil litigation by the SEC, defendants stunned the market by announcing that, in fact, the FDA had halted further clinical trials of Hemopure due to safety concerns. Defendants also disclosed that the commercial release of Hemopure in the United States would be delayed beyond mid-2004.

24. Market reaction to defendants belated disclosures was swift and severe. On

December 26, 2003, Biopure common shares lost over 16% of their value to close at $2.43 per share, representing a decline of more than 239% from a Class Period high of $8.25 per share, reached on or about August 21, 2003.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

25.  The Class Period begins on March 17, 2003. On that date, Biopure filed its quarterly report on Form 10-Q for the period ending January 31, 2003. The Form 10-Q, signed by defendant Richards reported that the Company had a net loss of $0.36 per share during the first quarter fiscal 2003 compared to a net loss of $0.38 for the same period last year. In addition the Form 10-Q included the following representations concerning the Company's Hemopure research and development efforts, stating in pertinent part as follows:

> Research and development expenses continue to include amounts for support of the BLA review process including responding to FDA inquiries, preparing for and participating in FDA inspections of facilities and documentation and preparing for a possible FDA Advisory Panel presentation. These BLA support costs were $2,232,000 for the first fiscal quarter of 2003 and are expected to continue at approximately the same level *until the middle of this calendar year, when the Company is hopeful that it will receive action by the FDA on the FLA.*
>
> * * *
>
> *If the FDA were to grant marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004.* We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure. [Emphasis added.]

26.  On or about March 25, 2003, Biopure issued a press release announcing that it has raised $13.4 million in gross proceeds through the sale of 5,548,480 shares of its common stock

10

at $2.42 per share. The press release stated in pertinent part as follows:

> Hemopure(R) [hemoglobin glutamer – (bovine)] is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating or reducing the need for allogenic red blood cell transfusion in these patients. Biopure's application to market Hemopure in the United States for a similar indication in adult patients undergoing elective orthopedic surgery is currently being reviewed by the U.S. Food and Drug Administration [...]
>
> * * *
>
> The previously announced $4.9 million in FY02/03 Congressional appropriations administered through the U.S. Army and anticipated $4 million in U.S. Navy funding from a Cooperative Research and Development Agreement (CRADA) *for clinical trials of Hemopure in trauma* are project-specific funds independent from Biopure's reported cash on hand. Completion of the pivotal RESUS clinical trial of Hemopure in trauma is contingent upon further funding. $908,900 of the Army funding is from Grant DAMD17-02-1-0697, for which the U.S. Army Medical Research Acquisition Activity, 820 Chandler Street, Fort Detrick MD 21702-5014 is the awarding and administering acquisition office. [Emphasis added.]

27.     On or about May 22, 2003, Biopure issued a press release announcing its financial results for the second fiscal quarter ended April 30, 2003. For the quarter, the company reported a net loss of $0.35 per common share, compared with a net loss of $0.49 per common share, for the corresponding period in 2002. Regarding the FDA's pending approval of Biopure's Hemopure BLA, the press release stated in pertinent part:

> Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery. As part of this review, the agency has inspected the company's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa. Biopure has responded to all questions raised by the FDA to date.

28.     On or about May 30, 2003, the Company issued a press release announcing that the FDA had notified Biopure that it will complete its review and act on the Company's BLA for

Hemopure by August 29, 2003. Defendant Moore commented on the FDA's review process:

> We're very pleased with the FDA's progress in reviewing our application[.] We continue to work closely with the agency toward a final decision that will allow us to make Hemopure available as an alternative to red blood cell transfusion. We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval.

29. On or about July 23, 2003, Biopure issued a press release announcing that it has raised $17.2 million in gross proceeds through the sale of 3,083,000 shares of its common stock at $5.58 per share.

30. On or about August 21, 2003, Biopure issued a press release announcing its financial results for the third fiscal quarter ended July 31, 2003. For the quarter, the Company reported a net loss of $0.28 per common share, compared with a net loss of $0.43 per common share, for the corresponding period in 2002. The press release included the following representations concerning the FDA's review of the Company's Hemopure BLA, stating in pertinent part as follows:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed its review of the company's BLA to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

31. On or about October 30, 2003, Biopure announced its plan to respond by June 30, 2004, to the FDA's questions regarding its BLA for Hemopure. The press stated that the Company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA. The press release stated in pertinent part as follows:

> During the past two months the company has had several substantive interactions

12